**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**NORTHERN DIVISION**

**JONATHAN HILBURN** **PLAINTIFF**

**v.** **Case No. 3:25-cv-00234 KGB**

**LEXICON, INC.** **DEFENDANT**

**OPINION AND ORDER**

Plaintiff Jonathan Hilburn brings claims against his former employer defendant Lexicon, Inc. (hereinafter "Lexicon"), alleging that Lexicon violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*., and the Arkansas Civil Rights Act ("ACRA"), Arkansas Code Annotated § 16-123-101, *et seq.* (Dkt. No. 2). Before the Court are Hilburn's motion for partial summary judgment (Dkt. No. 11) and Lexicon's motion for summary judgment (Dkt. No. 15). Lexicon responded to Hilburn's motion for partial summary judgment (Dkt. No. 18), and Hilburn responded to Lexicon's motion for summary judgment (Dkt. No. 20). Hilburn filed a reply to Lexicon's response to his motion for partial summary judgment (Dkt. No. 23). Lexicon filed a reply to Hilburn's response to its motion for summary judgment (Dkt. No. 22). For the following reasons, the Court denies Hilburn's motion for partial summary judgment (Dkt. No. 11) and grants Lexicon's motion for summary judgment (Dkt. No. 15).

## I. Factual Background

As required by Federal Rule of Civil Procedure 56 and Local Rules 56.1 and 7.2, the parties submitted statements of undisputed material facts in support of their motions for summary judgment (Dkt. Nos. 13; 17). Each party responded to the other's statements of undisputed material fact (Dkt. Nos. 19; 21). The Court recounts the facts from Hilburn's statement of undisputed material facts and Lexicon's statement of undisputed material facts (Dkt. No. 13; 17).

### A. Hilburn's Statement Of Undisputed Material Facts

In November 2021, Hilburn was hired by Lexicon as a Crane Operator (Dkt. No. 19, ¶ 1). Before joining Lexicon, Hilburn had prior experience working as a Crane Operator (*Id*., ¶ 2). Hilburn was a certified Crane Operator and had undergone training and obtained certifications through the National Commission for the Certification of Crane Operators ("NCCCO") and the National Center for Construction Education and Research ("NCCER") (*Id*.). On or about April 11, 2022, Hilburn was diagnosed by Randy Roberts, M.D., with Raynaud's disease and carpal tunnel syndrome (*Id*., ¶ 3). On April 20, 2022, Dr. Roberts diagnosed Hilburn with liver disease and systemic sclerosis (Scleroderma) (*Id*., ¶ 4).

At all relevant times, Brandy Thomas served as Lexicon's Benefits Manager (*Id*., ¶ 5). In that role, Thomas handled employee benefits and leave matters, including Family and Medical Leave Act (hereinafter "FMLA") and disability-related issues, and Thomas was the principal human resources representative involved in administering Hilburn's leave and communicating regarding his return to work (*Id*.).

Lexicon admits that Thomas communicated with Laura Rodriguez about Hilburn's medical leave and medical documentation. Lexicon further admits that Thomas communicated with Christina Sakevicius about Hilburn's medical leave, medical documentation, anticipated return to work, and eventual separation from employment (*Id*., ¶ 6). However, Thomas testified that she did not communicate with Rodriguez about Hilburn's separation from employment (*Id*. (Dkt. No. 11-4 (Thomas Dep.), at 69:2-6, 80:3-5, 80:20-22[1])). Thomas did not testify that she communicated with Rodriguez about Hilburn's return to work (Dkt. No. 19, ¶ 6). Accordingly, Lexicon disputes

[1] For these record cites, the Court cites to the CM/ECF Docket Number for the deposition and then to the precise line and page number of the deposition itself.

any statement to the contrary. Thomas was involved in the decision to terminate Hilburn's employment and personally communicated that decision to Hilburn on December 18, 2024 (Dkt. No. 19, ¶ 7).

Sakevicius served as Lexicon's Division Human Resources Manager for the Big River Steel location (*Id.*, ¶ 8). Sakevicius testified that her responsibilities included administering accommodation requests when such matters were brought to her attention (*Id.*). With respect to Hilburn, however, Sakevicius testified that Benefits and the Human Resources Vice President were managing such matters and "were making those decisions." (*Id.*). Danna Gauntt served as Lexicon's Vice President of Human Resources and was consulted by Thomas concerning Hilburn's employment status and potential separation (*Id.*, ¶ 9).

In July 2024, Jeffrey Cole, M.D., informed Hilburn that his right hand would require surgery, specifically a carpal-tunnel release (*Id.*, ¶ 10). The surgery would restrict Hilburn's ability to use his right hand and right upper extremity during his recovery (*Id.*). Dr. Cole is licensed to practice medicine in Tennessee and a board-certified orthopedic surgeon with an added qualification in hand surgery. Dr. Cole provided medical treatment to Hilburn in 2024 in connection with Hilburn's right carpal-tunnel release and subsequent recovery (*Id.*, ¶ 11). In connection with Hilburn's treatment and work status, Dr. Cole and/or his office received documentation concerning Hilburn's employment with Lexicon, including a written job description for the Crane Operator position (*Id.*, ¶ 12). Dr. Cole reviewed that job description in evaluating Hilburn's ability to return to work and determining appropriate medical restrictions (*Id.*). Lexicon provided Hilburn with the Crane Operator job duties as part of the FMLA paperwork for Hilburn to provide to Dr. Cole for completion and return to Lexicon (*Id.*). On July 30, 2024, approximately two months before his surgery, Hilburn informed his supervisor, Rick

Fry, that Hilburn's physician had advised that Hilburn would "be out of commission for a week, then [he] could possibly return to work. . . on light duty" following surgery (*Id.*, ¶ 13 (Dkt. No. 11-4, at 92 (Exhibit 9)).

By September 12, 2024, Rodriguez, a Hiring Office Manager for Lexicon, was aware of Hilburn's upcoming surgery and assisted Hilburn with obtaining and completing paperwork relating to FMLA leave and short-term disability benefits (Dkt. No. 19, ¶ 14). Hilburn testified that, on or about September 16, 2024, while he was completing paperwork for FMLA leave and short-term disability, he communicated to a "Hispanic lady" that he could "come back" and that she told him, "there's no light duty on new construction." (*Id.*, ¶ 15 (Dkt. No. 11-5 (Hilburn Dep.), at 127:4-17)). Hilburn testified that he understood "light duty" to mean performing work other than the full duties of his existing position while he recovered, and Hilburn testified that he believed he could perform work that did not require use of his right hand (Dkt. No. 19, ¶ 16).

Lexicon maintains Policy 5.1, entitled "Americans with Disabilities Act," which provides that Lexicon "will offer 'reasonable accommodation' to the known physical or mental disabilities of a qualified applicant or employee unless this accommodation would pose an undue hardship on the Company's operations." (*Id.*, ¶ 17). The policy further provides that "Human Resources will engage with the employee, and others within the Company as appropriate, [in] an interactive process to determine whether the Company can make accommodations." (*Id.*).

Sakevicius testified that, once Lexicon becomes aware that an employee may need a reasonable accommodation, Lexicon is obligated to engage in the interactive process (*Id.*, ¶ 18). Lexicon disputes that Lexicon was legally required to engage in the interactive process with Hilburn, maintaining that Hilburn's doctor repeatedly advised Lexicon Hilburn was unable to return to work in any capacity and, therefore, could not be accommodated (*Id.*). Sakevicius further

testified that Lexicon's interactive process involves determining an employee's actual "limitations" and "restrictions," potentially providing the employee's job requirements to his physician, and determining whether consultation with the physician is necessary (*Id.*, ¶ 19).

Sakevicius and Thomas both testified that, when considering reassignment as an accommodation, Lexicon may determine what positions are available and consider moving an employee to a different position (*Id.*, ¶ 20).

On December 6, 2024, Sakevicius emailed Thomas to inquire whether Hilburn remained covered by FMLA leave (*Id.*, ¶ 21). On December 9, 2024, Thomas informed Sakevicius that she had received an update concerning Hilburn, that Hilburn's FMLA leave had been extended through his December 16, 2024, appointment, and that Hilburn's physician anticipated releasing Hilburn to return to work at that appointment, subject to change following examination (*Id.*, ¶ 22). On December 9, 2024, Thomas also received faxed medical documentation from Dr. Cole's office reflecting his November 18, 2024, assessment of Hilburn (*Id.*, ¶ 23). The November 18, 2024, medical documentation stated that Hilburn was unable to push, pull, lift, or grip with his right upper extremity and indicated that Hilburn should be able to return to work following his next postoperative visit but also stated that the return-to-work date was "subject to change" (*Id.*, ¶ 24 (Dkt. No. 11-4, at 88)).

Sakevicius testified that she did not reach out to Hilburn to discuss the nature of his medical condition or his limitations (Dkt. No. 19, ¶ 25). Thomas did not request Hilburn's medical records from his December 16, 2024, appointment and did not contact Dr. Cole to determine Hilburn's abilities or restrictions following that appointment (*Id.*, ¶ 26). On December 18, 2024, at 10:54 a.m., Thomas emailed Sakevicius stating that she had not received anything new from Hilburn's physician and was "hoping he got released." (*Id.*, ¶ 27). Thomas thereafter called Hilburn (*Id.*, ¶

28). Hilburn informed Thomas that Hilburn's next medical appointment was approximately four to six weeks away and that Hilburn's physician would reevaluate Hilburn's ability to return to work at that time (*Id.*). During that same telephone call, Thomas informed Hilburn that Lexicon was terminating Hilburn's employment (*Id.*, ¶ 29).

Thomas testified at her deposition that, at the time of Hilburn's termination, Thomas understood that Hilburn's physical limitation involved his right hand and that he remained able to use his left hand (*Id.* ¶ 30). However, Dr. Cole provided Lexicon with medical orders saying that, post-surgery, Hilburn would be unable to perform one or more essential job functions, would not be able to return to work, and must remain off duty until further evaluation (*Id.* (Dkt. Nos. 15-6; 15-7; 15-18)). Thomas testified that she understood that Hilburn was unable to return to work in any capacity due to his physical limitations (Dkt. No. 19, ¶ 30 (Dkt. No. 11-4 (Thomas Dep.), at 9:24–10:2, 33:6–9, 34:24–35:3, 35:4–8, 35:24–36:6, 37:11–19, 38:20–21, 39:3–9, 41:5–16, 52:6–10, 76:2–13)).

During the December 18, 2024, call, Thomas did not ask Hilburn whether Hilburn could perform job functions using his left hand, whether he could perform another role for Lexicon notwithstanding his restrictions, or what specific restrictions his physician had placed upon him (Dkt. No. 19, ¶ 31). However, Lexicon maintains that Dr. Cole provided Lexicon with multiple medical orders saying that, post-surgery, Hilburn would be unable to perform one or more essential job functions, would not be able to use his right hand and upper extremity, would not be able to return to work, and must remain off duty until further evaluation (*Id.* (citing Dkt. Nos. 15-6; 15-7; 15-18)). Lexicon maintains that Thomas understood that Hilburn was unable to return to work in any capacity due to his physical limitations, which according to Lexicon rendered such questions pointless (Dkt. No. 19, ¶ 31 (citing Dkt. No. 11-4 (Thomas Dep.), at 9:24–10:2, 33:6–9, 34:24–

35:3, 35:4–8, 35:24–36:6, 37:11–19, 38:20–21, 39:3–9, 41:5–16, 52:6–10, 76:2–13)). Lexicon maintains that Dr. Cole's orders were clear that Hilburn was not cleared to perform work and must be "off duty," so Lexicon disputes that it was legally required to engage further in this process (Dkt. No. 19, ¶ 31).

Thomas likewise did not ask whether Hilburn could return to work if the work did not require use of Hilburn's right hand (*Id.*, ¶ 32). Lexicon contends that Thomas reasonably understood based on Dr. Cole's medical orders that Hilburn was unable to return to work in any capacity due to his physical limitations, and therefore Lexicon contends that understanding rendered the question pointless (*Id.*).

At his deposition, Hilburn testified that Thomas asked whether he could "return to full duty and run a crane," to which Hilburn responded "no." (*Id.*, ¶ 33 (citing Dkt. No. 11-5 (Hilburn Dep.), 241:22-25)). Lexicon disputes Hilburn's account because Thomas testified that she understood that Hilburn was unable to return to work in any capacity due to his physical limitations, and Hilburn's termination was not due to his inability to return to his prior position of Crane Operator (Dkt. No. 19, ¶ 33(citing Dkt. No. 11-4 (Thomas Dep.), at 33:6–9)). According to Lexicon, Hilburn was (and still is) not medically cleared to return to work in any capacity and, therefore, could not be accommodated (Dkt. No. 19, ¶ 33 (citing Dkt. No. 11-5 (Hillburn Dep.), at 16:1-6; 101:15–21, 109:5–18, 162:7–24, 177:2–5, 178:7–16, 182:2– 12)).

Hilburn contends that Thomas informed Hilburn that, until Hilburn could return to his full-duty crane-operator position, Lexicon would have to terminate his employment (Dkt. No. 19, ¶ 34 (citing Dkt. No. 11-4, at 100:23–101:9)). Lexicon disputes Hilburn's account because Thomas testified that she understood that Hilburn was unable to return to work in any capacity due to his

physical limitations and that Hilburn's termination was not due to his inability to return to his prior position of Crane Operator (Dkt. No. 19, ¶ 34 (citing Dkt. No. 11-4 (Thomas Dep.), at 33:6–9)).

Immediately following the call, at 2:44 p.m., Thomas emailed Sakevicius: "I just talked to him. Told him we weren't able to continue to hold his position because he's out for at least 6 more weeks. Do you want me to start the separation workflow?" (Dkt. No. 19, ¶ 35). In its Separation Notice, Lexicon identified the reason for Hilburn's termination as attendance, stating that Hilburn had exhausted his medical leave under the FMLA (*Id*., ¶ 36).

Dr. Cole testified in an affidavit in support of Hilburn's motion for summary judgment dated August 19, 2026,[2] that the medical restrictions Dr. Cole placed upon Hilburn during his

[2] Lexicon criticizes Dr. Cole's affidavit as a "sham affidavit" that the Court should disregard because it is an "after-the-fact recharacterization of his unambiguous medical documentation." (Dkt. No. 22, at 2). While the Court has concerns about Dr. Cole's affidavit in the light of his previously submitted medical documentation, the Court will not go so far as to label it a "sham." *See Button v. Dakota, Minn. & E. R.R. Corp*., 963 F.3d 824 (8th Cir. 2020) (examining the meaning of a "sham affidavit"); *Bass v. City of Sioux Falls*, 232 F.3d 615 (8th Cir. 1999) (same). Much of the affidavit is contradicted by the contemporaneous medical records of Dr. Cole and Hilburn's testimony at his deposition. Additionally, Hilburn attached to his statement of undisputed facts the complete medical records for Hilburn provided to Sunlife. Included in those records are the "Long-Term Disability Claim Statement – Attending Physician" (Dkt. No. 21-1, at 7-10). In this statement dated March 17, 2025, Dr. Cole notes that Hilburn has been "off duty" from September 18, 2024, to "TBD-discussing 5/14/2025" (*Id*., at 8), and that Hilburn is not capable of working with restrictions or limitations but is instead "off-duty" (*Id*., at 9). When given the opportunity on this form to impose specific restrictions or limitations, Dr. Cole did not. Further, Dr. Cole also specifically marks for functional limitations on the form that Hilburn is restricted *for both his left and right hand in simple grasping, firm grasping, fine manipulation, and keyboarding* (*Id*.) (emphasis added).

Neither Dr. Cole nor Hilburn, despite several opportunities to do so, communicated to Lexicon any time before Hilburn's termination that Hilburn's restrictions on returning to work were limited to the right upper extremity, that Dr. Cole's medical opinion was that Hilburn could perform some duties with his left hand, or that Dr. Cole could evaluate alternative duties or positions if asked to do so. Dr. Cole does not claim otherwise in his affidavit.

At the time of the relevant events, Dr. Cole submitted multiple documents stating that Hilburn was "unable to return to work" and must remain "off duty," one of which was "certified" under a fraud warning, asserting the information was "complete and true to the best of [Dr. Cole's] knowledge." (Dkt. No. 11-5, at 107-120; *see also* Dkt. No. 11-5, at 114 ("unable to return to work: The patient will be off duty until further evaluation"), 116 (same), 118 ("patient is off duty until

recovery were directed toward protecting Hilburn's right hand and right upper extremity (*Id*., ¶ 37 (citing Dkt. No. 11-8, ¶¶ 10-11)). Lexicon disputes that Dr. Cole stated this in his contemporaneous medical records. Dr. Cole's medical records from the time of treatment state that Hilburn is "off duty" until cleared to return to work by Dr. Cole (Dkt. No. 19, ¶ 37) (*see, e.g.,* Dkt. Nos. 15-18, at 1 (stating that patient "is off duty until cleared by Dr. Cole. Patient is unable to use right wrist . . . off duty – due to post—op restrictions."); 15-6, at 3–4 (stating that patient "will need to be off duty until cleared at one of the post-op visits and the employee will not be

---

cleared by Dr. Cole. Patient is unable to use right wrist. . . . More will be known at his next post-op visit on 12/16/24. By then Mr. Hilburn should be able to return to work *subject to change*"), 119 (fraud warning)). The "fraud warning" which appears on Hilburn's application with Sun Life Assurance Company of Canada for short-term disability medical benefits provides that "[a]ny person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in person." (*Id.*, at 119).

Dr. Cole cannot now, years later, in a document created solely for litigation, claim that those unambiguous certified representations meant something other than what they plainly stated. *Alexander v. Northland Inn*, 321 F.3d 723, 727 (8th Cir. 2003), is instructive. In that case, the district court granted summary judgment in favor of the employer on plaintiff's ADA claim, and the Eighth Circuit affirmed. *Id.* In pertinent part, plaintiff Alexander first argued that she could perform the essential function of vacuuming without accommodation because she could in fact do the required vacuuming, as she had in the many months prior to her termination. *Id.* However, the Eighth Circuit rejected that argument, determining that her employer "Northland was entitled to rely and act upon the written advice from Alexander's physician that unambiguously and permanently restricted her from vacuuming." *Id.* Specifically, the Eighth Circuit determined: "The ADA does not require an employer to permit an employee to perform a job function that the employee's physician has forbidden." *Id.* Moreover, in *Alexander*, the Eighth Circuit also determined it was "irrelevant" that "the physician told Alexander, after termination, that she could go ahead and vacuum. Northland was reasonable in relying on his earlier definitive command, 'No vacuuming.'" *Id.* *See also Gerdes v. Swift-Eckrich, Inc.*, 949 F. Supp. 1386, 1406 (N.D. Iowa 1996) (determining that "information concerning [plaintiff's] medical condition and the nature of appropriate work restrictions was uniquely available to [plaintiff].").

Finally, even if Dr. Cole had evaluated Hilburn for his ability to return to work, Dr. Cole would have had to confront Hilburn's admission in his deposition that it takes two hands to operate a crane and that, since his surgery, Hilburn would not feel comfortable operating a crane because it would be unsafe to do so (*see* Dkt. No. 11-5 (Hilburn Dep.), at 86:2-87:18, 230:25-231:5, 246:4-6)).

Accordingly, the Court will give Hilburn's submission of Dr. Cole's affidavit the appropriate weight that it deserves, acknowledging that it is an after-the-fact affidavit prepared for litigation.

able to use Right upper extremity."); 15-7, at 2 (stating that patient is "unable to return to work: The patient will be off duty until further evaluation."); 15-18, at 2 (stating that patient is "unable to return to work: The patient will be off duty until further evaluation in 4 weeks.")).

Dr. Cole testified in an affidavit in support of Hilburn's motion for summary judgment dated August 19, 2026, that Dr. Cole's restrictions were not intended to indicate that Hilburn had lost the use of his left hand or left upper extremity and that Dr. Cole did not determine that Hilburn was medically incapable of using his left hand or left upper extremity to perform work activities (Dkt. No. 19, ¶ 38). Lexicon disputes that Dr. Cole stated this in his contemporaneous medical records. Dr. Cole's medical records from the time of treatment state that Hilburn was not permitted to work in any capacity and must remain "off duty" until medically cleared, not that Hilburn was medically capable of working with his left hand (*Id.* (citing Dkt. Nos. 15-6; 15-7; 15-18)). Lexicon also notes that Hilburn testified that, as of August 2026, Hilburn had not been medically cleared to return to work in any capacity, light duty or otherwise (Dkt. No. 19, ¶ 38 (citing Dkt. No. 15-1 (Hilburn Dep.), at 101:19–21, 109:14-18, 162:7–24,)).

Medical documentation provided by Dr. Cole in support of Hilburn's FMLA certification indicates that Dr. Cole did not determine that Hilburn was medically incapable of performing every individual duty identified in Lexicon's Crane Operator job description but rather that Hilburn was not capable of performing one or more of his essential job functions based on Dr. Cole's review of the Crane Operator job description (Dkt. No. 19, ¶ 39). Both the FMLA certification and the subsequent medical orders provided by Dr. Cole state that Hilburn was not permitted to work and must remain "off duty" until cleared (*Id*. (citing Dkt. Nos. 15-6; 15-7; 15-18)). Hilburn testified that, as of August 2026, Hilburn had not been medically cleared to return to work in any capacity,

light duty or otherwise (Dkt. No. 19, ¶ 39 (citing Dkt. No. 15-1 (Hilburn Dep.), at 101:19–21, 109:14-18)).

Dr. Cole testified in his affidavit in support of Hilburn's motion for summary judgment dated August 19, 2026, that to the extent a duty identified in Lexicon's Crane Operator job description could safely be performed without use of Hilburn's restricted right hand and right upper extremity, Dr. Cole maintains in in the affidavit that he did not independently prohibit Hilburn from performing that duty (Dkt. No. 19, ¶ 40). Lexicon disputes Dr. Cole's statement because medical documentation provided by Dr. Cole in support of Hilburn's FMLA certification indicates that Dr. Cole determined that Hilburn was not permitted to work in any capacity without exception or reference to the Crane Operator job description (*Id.* (citing Dkt. Nos. 15-6; 15-7; 15-18)). Lexicon maintains that nothing in Dr. Cole's contemporaneous medical records gave any indication that Hilburn could work in another position, and Hilburn testified that, as of August 2026, Hilburn had not been medically cleared to return to work in any capacity, light duty or otherwise (Dkt. No. 19, ¶ 40 (citing Dkt. No. 15-1 (Hillburn Dep.), at 101:19–21, 109:14-18)).

Dr. Cole testified in his affidavit in support of Hilburn's motion for summary judgment dated August 19, 2026, that Dr. Cole's restrictions were not intended to state that Hilburn was incapable of performing work of any kind for Lexicon; rather, Dr. Cole's concern was whether particular work activities would require use of Hilburn's right hand and right upper extremity in a manner inconsistent with the restrictions imposed during his recovery (Dkt. No. 19, ¶ 41). Lexicon disputes Dr. Cole's statement because medical documentation provided by Dr. Cole in support of Hilburn's FMLA certification indicates that Dr. Cole determined that Hilburn was not permitted to work in any capacity, not that Hilburn was limited to activities that require use of Hilburn's right hand and right upper extremity (*Id.* (citing Dkt. Nos. 15-6; 15-7; 15-18)). Hilburn testified

that, as of August 2026, Hilburn had not been medically cleared to return to work in any capacity, light duty or otherwise (Dkt. No. 19, ¶ 41 (citing Dkt. No. 15-1 (Hilburn Dep.), at 101:19–21, 109:14-18)).

Before terminating Hilburn, Thomas did not consult Hilburn's supervisor, Rick Fry, regarding whether an accommodation could be made that would permit Hilburn to work without using his right hand (Dkt. No. 19, ¶ 42). Thomas also did not seek additional information from Dr. Cole on or before December 18, 2024 (*Id.*, ¶ 43). Lexicon admits that Thomas did not seek additional information from Dr. Cole (*Id.*). However, Lexicon maintains that Thomas understood, in accordance with Dr. Cole's medical reports, that Hilburn was unable to return to work in any capacity and must remain "off duty" until medically cleared (*Id.* (citing Dkt. No. 11-4 (Thomas Dep.), at 9:24–10:2, 33:6–9, 34:24–35:3, 35:4–8, 35:24–36:6, 37:11–19, 38:20–21, 39:3–9, 41:5–16, 52:6–10, 72:20–73:2, 76:2–13)).

Thomas did not know whether modifications to Hilburn's crane-operator position were possible and did not consider whether that position could be modified before terminating Hilburn (Dkt. No. 19, ¶ 44). Sakevicius similarly testified that she could not recall considering job modifications for Hilburn (*Id.*, ¶ 45). Thomas did not review Hilburn's medical records on December 18, 2024, to determine whether additional leave could be provided as a reasonable accommodation (*Id.*, ¶ 46).

Dr. Cole testified in his affidavit in support of Hilburn's motion for summary judgment dated August 19, 2026, that, if Lexicon had requested clarification regarding whether Hilburn could perform particular Crane Operator duties using his left hand while protecting his restricted right hand, Dr. Cole could have evaluated those particular duties in the light of Hilburn's then-existing medical restrictions (*Id.*, ¶ 47). Lexicon disputes Dr. Cole's statement in his affidavit,

asserting that Dr. Cole received the Crane Operator job description and reviewed it to determine Hilburn's medical restrictions (*Id*. (citing Dkt. No. 11-8, ¶¶ 5–7)). Lexicon asserts that the medical records from Dr. Cole, written while Dr. Cole was in possession of the Crane Operator job description, indicate that Hilburn was not permitted to work in any capacity (Dkt. No. 19, ¶ 47 (citing Dkt. Nos. 15-6; 15-7; 15-18)). Moreover, Lexicon maintains that working as a Crane Operator requires the use of two hands, and Hilburn admitted he could not safely operate a crane without the use of both hands (Dkt. No. 19, ¶ 47 (citing Dkt. No. 11-5 (Hilburn Dep.), at 86:2–87:18, 246:4-6)). The ability to operate a crane is an essential function of the position, as is regular attendance (Dkt. No. 19, ¶ 47 (citing Dkt. No. 15-17)). Dr. Cole provided Lexicon with multiple medical orders stating that, post-surgery, Hilburn would be unable to return to work and must remain "off duty" until Hilburn was medically cleared to return to work (Dkt. No. 19, ¶ 47 (citing Dkt. Nos. 15-6; 15-7; 15-18)).

Dr. Cole testified in his affidavit in support of Hilburn's motion for summary judgment dated August 19, 2026, that had Lexicon proposed a modification to Hilburn's existing position that would have permitted Hilburn to work without using his right hand in a manner inconsistent with his restrictions, Dr. Cole could have evaluated whether the proposed modification was medically appropriate (Dkt. No. 19, ¶ 48). Lexicon disputes Dr. Cole's statement in his affidavit stating that Dr. Cole received the Crane Operator job description and reviewed it to determine Hilburn's medical restrictions (*Id*. (citing Dkt. No. 11-8, ¶¶ 5–7)). Lexicon also maintains that the medical records from Dr. Cole, written while Dr. Cole was in possession of the job description, indicate that Hilburn was not permitted to work in any capacity (Dkt. No. 19, ¶ 48 (citing Dkt. Nos. 15-6; 15-7; 15-18)). Moreover, Lexicon maintains that working as a Crane Operator requires the use of two hands, and Hilburn admitted that he could not safely operate a crane without the use

of both hands (Dkt. No. 19, ¶ 48 (citing 11-5 (Hilburn Dep.), at 86:2–87:18, 246:4-6)). The ability to operate a crane is an essential function of the position, as is regular attendance (Dkt. No. 19, ¶ 48 (citing Dkt. No. 15-17)). Lexicon asserts that Dr. Cole provided Lexicon with multiple medical orders stating that, post-surgery, Hilburn would be unable to return to work and must remain "off duty" until Hilburn was medically cleared to return to work (Dkt. No. 19, ¶ 48 (citing Dkt. Nos. 15-6; 15-7; 15-18)).

Dr. Cole testified in his affidavit in support of Hilburn's motion for summary judgment dated August 19, 2026, that Dr. Cole does not recall Lexicon contacting Dr. Cole or his office before Hilburn's termination to ask whether particular Crane Operator duties could be performed using Hilburn's left hand while his right hand remained restricted (Dkt. No. 19, ¶ 49). Lexicon admits this statement, but Lexicon notes that the medical records from Dr. Cole indicate that Hilburn was not permitted to work in any capacity and do not indicate that Hilburn is permitted to work, conditioned on the exclusive use his left hand (*Id.* (citing Dkt. Nos. 15-6; 15-7;15-18)). Moreover, Lexicon points out that working as a Crane Operator requires the use of two hands, and Hilburn admitted that he could not safely operate a crane without the use of both hands. (Dkt. No. 19, ¶ 49 (citing Dkt. No. 11-5 (Hilburn Dep.), at 86:2–87:18, 246:4-6)). The ability to operate a crane is an essential function of the position, as is regular attendance (Dkt. No. 19, ¶ 49 (citing Dkt. No. 15-17)).

Dr. Cole testified in his affidavit in support of Hilburn's motion for summary judgment dated August 19, 2026, that Dr. Cole does not recall Lexicon asking him to clarify whether Hilburn could perform some, but not all, of the duties identified in the Crane Operator job description (Dkt. No. 19, ¶ 50). Lexicon disputes Dr. Cole's statement in his affidavit stating that Dr. Cole received the Crane Operator job description and reviewed it to determine Hilburn's medical restrictions (*Id.*

(citing Dkt. No. 11-8, ¶¶ 5-7)). Lexicon maintains that the medical records from Dr. Cole, written while Dr. Cole was in possession of the job description, indicate that Hilburn was not permitted to work in any capacity and do not indicate that Hilburn could perform any job duties in the Crane Operator job description or otherwise (*Id*. (citing Dkt. Nos. 15-6; 15-7, 15-18)).

Dr. Cole testified in his affidavit in support of Hilburn's motion for summary judgment dated August 19, 2026, that, if Lexicon had made either inquiry, Dr. Cole could have evaluated the proposed duties or modifications based upon Hilburn's medical condition and restrictions at that time (Dkt. No. 19, ¶ 51). Lexicon disputes Dr. Cole's statement in his affidavit stating that Dr. Cole received the Crane Operator job description and reviewed it to determine Hilburn's medical restrictions (*Id*. (citing Dkt. No. 11-8, ¶¶ 5-7)). Lexicon maintains that the medical records from Dr. Cole, written while Dr. Cole was in possession of the job description, indicate that Hilburn was not permitted to work in any capacity and do not indicate that Hilburn could perform any job duties in the Crane Operator job description or with his left hand (Dkt. No. 19, ¶ 51 (citing Dkt. Nos. 15-6; 15-7, 15-18)).

Sakevicius likewise testified that she could not recall considering additional leave as an accommodation for Hilburn after the expiration of his FMLA leave (Dkt. No. 19, ¶ 52). At the time of Hilburn's termination, Thomas understood that Hilburn's next medical appointment was approximately six weeks away (*Id*., ¶ 53). Lexicon maintains that there was no guarantee or even an indication that Hilburn would be medically cleared to return to work after that appointment (*Id*. (citing Dkt. No. 11-4 (Thomas Dep.), at 42:12–15)). Hilburn was not, and has not been since then, cleared to return to work (Dkt. No. 19, ¶ 53 (citing Dkt. No. 11-5 (Hilburn Dep.), at 16:1-6; 101:15–21, 109:5–18, 162: 7–24, 177:2–5, 178:7–14, 182:2–12)). Thomas testified that Lexicon could not hold Hilburn's position indefinitely (Dkt. No. 19, ¶ 54). Thomas testified that, at that

point, it appeared to be an indefinite period because the next visit was going to be six-weeks out, and there was no guarantee that Hilburn could come back at the end of that next six weeks (*Id.* (citing Dkt. No. 11-4 (Thomas Dep.), at 42:12–15)). Hilburn was not, and has not been since then, cleared to return to work (Dkt. No. 19, ¶ 54 (citing Dkt. No. 11-5 (Hilburn Dep.), at 16:1-6, 101:15–21, 109:5–18, 162: 7–24, 177:2–5, 178:7–14, 182:2–12)).

At the time Thomas decided to terminate Hilburn, no separate ADA accommodation analysis had been completed apart from the administration of Hilburn's FMLA leave (Dkt. No. 19, ¶ 55). Lexicon maintains that, based on Thomas's testimony, Thomas understood from Dr. Cole's multiple medical orders that Hilburn was unable to return to work in any capacity due to his physical limitations, rendering any formal analysis futile (*Id.* (citing Dk. No. 11-4 (Thomas Dep.), at 9:24–10:2, 33:6–9, 34:24–35:3, 35:4–9, 35:24–36:6, 37:11–19, 38:20–21, 39:3–9, 41:5–16, 52:6–10, 76:2–13)).

Thomas concedes that Lexicon did not engage in the interactive process with Hilburn before terminating his employment (*Id.*, ¶ 56). Lexicon maintains that Thomas reasonably understood from Dr. Cole's multiple medical orders that Hilburn was unable to return to work in any capacity due to his physical limitations, rendering any further discussion futile (*Id.* (citing Dkt. No. 11-4 (Thomas Dep.), at 9:24–10:2, 33:6–9, 34:24–35:3, 35:4–9, 35:24–36:6, 37:11–19, 38:20–21, 39:3–9, 41:5–16, 52:6–10, 76:2–13)).

Lexicon conducted no analysis regarding whether providing Hilburn with additional leave would impose an undue hardship and no analysis regarding whether providing Hilburn an alternative position would impose an undue hardship (Dkt. No. 19, ¶ 57). Lexicon maintains that Thomas reasonably understood from Dr. Cole's multiple medical orders that Hilburn was unable to return to work in any capacity due to his physical limitations, rendering any further discussion

futile (*Id*. (citing Dkt. No. 11-4 (Thomas Dep.), at 9:24–10:2, 33:6–9, 34:24–35:3, 35:4–9, 35:24–36:6, 37:11–19, 38:20–21, 39:3–9, 41:5–16, 52:6–10, 76:2–13)).

Thomas testified that no specific alternative positions were identified for Hilburn and that Thomas never requested a list of Hilburn's specific restrictions (Dkt. No. 19, ¶ 58). Before Hilburn's termination, Thomas and Human Resources Vice President Gauntt did not discuss any particular roles for Hilburn; they did not discuss in "general terms of what was open and hypothetical 'what if' . . . because at that point, everything [they] had received from all of the updates was that he couldn't return to work. He couldn't return to work." (*Id*., ¶ 59 (quoting Dkt. No. 11-4 (Thomas Dep.), at 51:12-23)). Thomas did not ask Hilburn whether he would consider an alternative position and was not aware of anyone else at Lexicon who discussed an alternative position with Hilburn before his termination (Dkt. No. 19, ¶ 60).

Sakevicius likewise could not recall considering alternative positions for Hilburn and testified that she did not ask Hilburn whether he would consider an alternative position (*Id*., ¶ 61). Before December 18, 2024, Thomas did not obtain the job descriptions or qualification requirements for the vacant positions that Lexicon later identified during discovery as having been available during the relevant period (*Id*., ¶ 62). Before terminating Hilburn, Thomas did not review the job descriptions or qualification requirements for those vacant positions and did not compare Hilburn's resume or employment qualifications against them (*Id*., ¶ 63).

### B. Lexicon's Statement Of Undisputed Material Facts

A Crane Operator at Lexicon is required to be able to operate a crane (Dkt. No. 21, ¶ 2). In or around March 2022, Hilburn began experiencing severe pain, numbness, and excessive coldness in his hands (*Id*., ¶ 3). To accommodate Hilburn and allow him to continue working as a Crane Operator, Lexicon purchased an approximately $1.1 million-dollar heated crane (*Id*., ¶ 4).

In July 2024, Hilburn informed his supervisor, Rick Frye, that Hilburn would need surgery for carpal tunnel and "told them that, you know, the doctor said I'd be – be able to return on light duty and joked with [Frye]" that Hilburn "can still run the crane with one hand and I can boom up and down with my right foot" (*Id.*, ¶ 5 (quoting Dkt. No 11-5 (Hilburn Dep.), at 230:4–10)). Hilburn also told Frye that Hilburn could return to work on "light duty" after his surgery (Dkt. No. 21, ¶ 6). This text message, sent before his surgery, was the only time Hilburn communicated with someone at Lexicon that Hilburn believed Hilburn could return to work (*Id.*, ¶ 7). On or about September 16, 2024, while completing paperwork related to his FMLA leave and short-term disability, Hilburn again informed the Lexicon representative assisting Hilburn that he could return to work and requested light-duty work (*Id.* (citing Dkt. No. 11-5 (Hilburn Dep., at 127:4-17)). Hilburn testified that he was told in response that "there's no light duty on new construction." (*Id.*).

On September 12, 2024, Lexicon provided Hilburn with notice under the FMLA and informed Hilburn that his leave had been approved (Dkt. No. 21, ¶ 8). Lexicon also told Hilburn that Hilburn must ensure payment of his weekly premiums to maintain health insurance coverage while on leave (*Id.*, ¶ 9).

On September 17, 2024, Lexicon received from Hilburn's physician, Dr. Cole at OrthoSouth, an FMLA certification indicating that Hilburn would undergo surgery on September 18, 2024, and that Hilburn would be incapacitated from September 18, 2024, until "TBD" (*Id.*, ¶ 10). Dr. Cole stated that Hilburn "will not be able to use right upper extremity." (*Id.* (citing Dkt. No. 15-6)). Dr. Cole estimated that the period of incapacitation would be "up to 4-6 weeks" with an end date "T[o] B[e] D[etermined]" following the September 18, 2024, surgery (Dkt. No. 21, ¶ 10 (citing Dkt. No. 15-6, at 3)). The certification also states that Hilburn "will need to be off duty until cleared at one of the post-op visits." (Dkt. No. 21, ¶ 11).

Hilburn had his first post-op appointment on September 26, 2024 (*Id.*, ¶ 12). Hilburn had another post-op appointment on October 16, 2024 (*Id.*, ¶ 13). After that appointment, Dr. Cole wrote that Hilburn was "unable to return to work" and "off duty until further evaluation." (*Id.*, ¶ 14). Hilburn was further evaluated on November 18, 2024, where again, Dr. Cole wrote that Hilburn was "unable to return to work" and "off duty until further evaluation in 4 weeks." (*Id.*, ¶ 15).

After the November 18, 2024, appointment, OrthoSouth informed Hilburn that it believed Hilburn may be able to return to work on December 16, 2024, subject to change, but that more would be known at Hilburn's post-op visit on December 16, 2024 (*Id.*, ¶ 16).

At his appointment in four weeks, Hilburn was still not released for work; Dr. Cole told Hilburn, according to Hilburn's deposition testimony, that Hilburn needed more time and at least six more weeks of additional leave (Dkt. No. 17, ¶ 17 (citing Dkt. No.11-5 (Hilburn Dep.), 109:9-15, 162: 7–24, 240:18-241:7)).

Thomas, Lexicon's benefits manager in 2024, understood that Hilburn could not return to work at all (Dkt. No. 21, ¶ 18).

Since Hilburn first left on FMLA leave, Hilburn failed to pay any of his health insurance premiums while he was on leave since September 2024 (Dkt. No. 21, ¶ 19). By December 18, 2024, Lexicon calculated an outstanding balance of $935.45 (*Id.*).

Hilburn did not offer any suggestions of reasonable accommodations that would allow Hilburn to perform the essential functions of the Crane Operator position; because of his medical limitations, Hilburn could not, and still cannot, operate a crane (*Id.*, ¶ 20). Hilburn disputes this, citing his pre-surgery references to "light duty" and the affidavit he submitted from Dr. Cole during this litigation (*Id.*).

Hilburn did not request an extension of leave after the conclusion of his FMLA leave (*Id.*, ¶ 21). Lexicon contends that, because Hilburn's medical records stated that Hilburn could not return to work in any capacity and that Hilburn had no definite return to work date, Lexicon terminated Hilburn's employment on December 18, 2024 (*Id.*, ¶ 22). Hilburn disputes this, citing the affidavit he submitted from Dr. Cole during this litigation and also claiming "[n]or was Hilburn's anticipated period of restriction necessarily indefinite." (*Id.*). Hilburn claims that Hilburn was willing and able to work what he called "light duty." (*Id.*, ¶ 23). However, Hilburn admits that he was not aware of any alternative position that was open for which he was qualified (*Id.*, ¶ 24).[3]

Hilburn was also informed that Hilburn needed to pay the overdue insurance premiums (*Id.*, ¶ 25). After being informed of the outstanding balance, Hilburn paid the amount requested by Lexicon, which Lexicon received and accepted (*Id.*).

After verbally informing Hilburn of his separation, Lexicon sent a termination letter to Hilburn via email (*Id.*, ¶ 26). Hilburn responded that Hilburn wanted to "go through with cobra." (*Id.*, ¶ 27). Hilburn eventually paid Lexicon the overdue medical premiums (*Id.* ¶ 28).[4] Also on December 23, 2024, at Hilburn's request, Thomas reached out to Lexicon's COBRA administrator, Consolidated Admin Services ("CAS"), to request expedited benefits paperwork so Hilburn could have medical coverage for an appointment in January 2025 (*Id.*, ¶ 29). Hilburn notes, however, that on December 23, 2024, Hilburn expressly informed Thomas that he wanted to "keep his

[3] Although Hilburn disputes this statement, he fails to cite to any record evidence in support (Dkt. No. 21, ¶ 24). Accordingly, the fact is deemed admitted.

[4] Although Hilburn disputes this statement, he fails to cite to any record evidence in support (Dkt. No. 21, ¶ 28). Accordingly, the fact is deemed admitted.

insurance and go through with the COBRA." (*Id.*). Thomas acknowledged that she did not respond to Hilburn's communication (*Id.*).

CAS sent a letter to Hilburn, at his correct address, on January 6, 2025, that explained how to elect COBRA coverage (*Id.*, ¶ 30). Hilburn testified that he never received the January 6, 2025, letter (*Id.*). Lexicon's records confirm that CAS sent Hilburn this letter (*Id.*, ¶ 31). In correspondence between Hilburn and Thomas dated July 25, 2025, Hilburn asks Thomas for "the cobra benefits administrators name and number." (*Id.* (citing Dkt. No. 15-13)). In January 2025, Hilburn needed to submit the attached form to CAS by March 7, 2025 (Dkt. No. 21, ¶ 32). Hilburn did not do so, allegedly because he did not receive the letter from CAS (*Id.*, ¶ 33). Accordingly, Hilburn's health insurance coverage ended (*Id.*, ¶ 34).

Hilburn began receiving Long-Term Disability benefits from Sun Life beginning on March 19, 2025, prior to which Hilburn was receiving short-term disability payments (*Id.*, ¶ 35). Similarly, Hilburn was approved for waiver of premiums for his Sun Life insurance policy, effective March 18, 2025, because he was "totally disabled" consistent with the group policy's life waiver of premium provision (*Id.*, ¶ 36 (Dkt. No. 15-16, at 1)). Hilburn disputes that he was in fact totally disabled or incapable of working with a reasonable accommodation (Dkt. No. 21, ¶ 36). As set forth above, relying on Dr. Cole's affidavit attached to his motion for summary judgment, Hilburn contends that his medical restrictions concerned his right hand and right upper extremity, and Hilburn contends again relying on Dr. Cole's affidavit attached to his motion for summary judgment that the record reflects that Hilburn remained capable of using his left hand and that Hilburn had repeatedly communicated his willingness and ability to perform light duty work (*Id.* (citing Dkt. Nos. 13, ¶¶ 37-40; 11-8, ¶¶ 10-15)). Hilburn further asserts that there is no record evidence that "Hilburn maintains the Life-Insurance benefits or ever completed such forms"

(Dkt. No. 21, ¶ 36).[5] Hilburn states that Lexicon "relies on the definition of 'total disability' from the Life Insurance benefit waiver form – although it has no evidence was completed by Hilburn to attest to his scope of disability." (*Id.*).

As Hilburn was advised by Sun Life, the waiver of premium definition of "totally disabled" required that Hilburn be "unable to do the material and substantial duties of any occupation based on [Hilburn's] education, training, and experience." (*Id.*, ¶ 37).[6] Hilburn did not attempt to inquire further about COBRA coverage until July 2025, when he received all the information he asked for (*Id.*).

During the course of Hilburn's active employment, prior to his leave, there was never a situation where he was trying to get information and nobody at Lexicon would help him (*Id.*, ¶ 38).

As of Hilburn's deposition August 4, 2026, Hilburn's condition had not changed since his initial surgery in September 2024, and he still has not been medically released to return to work (*Id.*, ¶ 39 (citing Dkt. No. 15-1 (Hilburn Dep.), at 12:8-13, 15:22-16:4, 101:18-21, 102:7-103:10, 106:12-20, 108:2-4, 109:14-16, 113:8-11, 162: 7–24, 177:2-5, 182:4-12)). Despite Hilburn's own deposition testimony cited by Lexicon in support of this statement, Hilburn attempts to dispute

[5] The Court does not understand this contention by Hilburn. The Court observes, having reviewed the record evidence, that medical records provided to Sun Life by Hilburn's medical providers are attached to Hilburn's response to Lexicon's statement of undisputed material facts (Dkt. Nos. 21-1; 21-2). The documents indicate that Hilburn applied for and was awarded benefits for both short-term disability and long-term disability (Dkt. No. 21-2). Additionally, at his deposition, Hilburn testified that Hilburn could not collect unemployment because Hilburn was "on short-term disability" and was still receiving long-term disability (Dkt. No. 11-5 (Hilburn Dep.), at 22:22–25; 24:2–3; 28:11-12; 54:23–25). Additionally, Hilburn had long-term disability, but not health insurance, and applied for and received a waiver of payment of his life insurance premium (Dkt. No. 11-5 (Hilburn Dep.), at 64:3–5).

[6] Although Hilburn disputes this statement, he fails to cite to any record evidence in support (Dkt. No. 21, ¶ 37). Accordingly, the fact is deemed admitted.

this, again relying in part on Dr. Cole's affidavit attached to his motion for summary judgment (Dkt. No. 21, ¶ 39).

Hilburn applied for Social Security Benefits with the Social Security Administration on July 21, 2026, stating under penalty of perjury, "I became unable to work because of my disabling condition on September 16, 2024." (*Id.*, ¶ 40). Hilburn testified that he has applied for four or five jobs (*Id.* (citing Dkt. No. 15-1 (Hilburn Dep.), at 15:1- 4)).

On September 26, 2025, Hilburn filed his complaint in the Circuit Court of Craighead County (Dkt. No. 2). Lexicon removed this matter to this Court on October 24, 2025, pursuant to 28 U.S.C. § 1331 (Dkt. No. 1).

## II. Overview Of The Arguments

### A. Hilburn's Motion For Partial Summary Judgment

In his complaint, Hilburn asserts failure to accommodate claims under the ADA and ACRA (Dkt. No. 11, ¶ 1). Hilburn claims that he is a qualified individual with a disability, that Lexicon was aware of his disability and need for accommodation, and that facially reasonable accommodations were available, including a finite period of additional leave and reasonable modification of his existing position (Dkt. Nos. 11, ¶ 3; 12, at 4–17). In his motion for partial summary judgment, Hilburn argues that he is entitled to partial summary judgment on his failure to accommodate claims because, upon the expiration of Hilburn's FMLA leave, "Lexicon terminated his employment without engaging in the interactive process required to identify a reasonable accommodation, conducting a separate ADA accommodation analysis, or determining whether the accommodations available to Hilburn were reasonable or would impose an undue hardship" (Dkt. No. 11, ¶ 4). Hilburn asserts that the amount of damages resulting from Lexicon's violations must be determined at trial (*Id.*, ¶ 7).

Lexicon responds that the Court should deny Hilburn's motion for partial summary judgment on his failure to accommodate claim because Hilburn has not established that he was a "qualified individual" capable of performing the essential functions of his job, with or without reasonable accommodation, at the time of the relevant events (Dkt. No. 18, at 1). Moreover, Lexicon argues that it did not fail to engage in the interactive process because Hilburn was never cleared by his doctor to return to work, that Hilburn never made a formal request to return, and, even if Hilburn had made a formal request to return, he could not have been reasonably accommodated (*Id.*, at 10–16). Lexicon argues that Hilburn's proposed accommodations are unreasonable and fail as a matter of law (*Id.*, at 16–20). Finally, Lexicon maintains that it had a legitimate, non-discriminatory reason for terminating Hilburn (*Id.*, at 20–21).

**B. Lexicon's Motion For Summary Judgment**

For its motion for summary judgment, Lexicon argues that Hilburn has not established that he is a "qualified individual" under the ADA (Dkt. No. 16, at 6). Lexicon contends that Hilburn did not offer any suggestions of reasonable accommodations that would allow him to perform the essential functions of the Crane Operator position (*Id.*, at 7). Further, Lexicon maintains that Hilburn has not made a facial showing that he satisfied the legitimate prerequisites for an alternative position and that he would be able to perform the essential functions of that position with or without accommodation (*Id.*). To the extent that Hilburn argues that Lexicon violated the ADA by not engaging in the interactive process, Lexicon argues that Hilburn cannot show that he could have been reasonably accommodated but for Lexicon's lack of good faith (*Id.*).

To the extent that Hilburn claims that he should have received more leave after the exhaustion of his FMLA leave, Lexicon argues that this claim fails because an indefinite leave of absence is not a reasonable accommodation under the ADA as a matter of law (*Id.*, at 10). As to

Hilburn's claim that Lexicon failed to provide proper notice or guidance of the COBRA election process or other benefits, Lexicon contends that this claim fails because Hilburn cannot establish that Lexicon took this action as a result of Hilburn's disability (*Id.*, at 11–12). Finally, Lexicon maintains that it had a legitimate, non-discriminatory reason for terminating Hilburn's employment and benefits, and Hilburn cannot establish it was a pretext for unlawful discrimination (*Id.*, at 13–15).

**III. Summary Judgment Legal Standard**

Summary judgment is appropriate if there is no genuine issue of material fact for trial. *UnitedHealth Grp. Inc. v. Exec. Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Fed. R. Civ. P. 56). Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact such that the movant is entitled to entry of judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The party requesting summary judgment is 'entitled to judgment as a matter of law,' Fed. R. Civ. P. 56(c), if the non-movant fails 'to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Vaughn v. Wallace*, 496 F.3d 908, 910–11 (8th Cir. 2007) (quoting *Sallis v. Univ. of Minn.*, 408 F.3d 470, 474 (8th Cir. 2005)).

"In ruling on a motion for summary judgment, '[t]he district court must base its determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.'" *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923–24 (8th Cir. 2004) (internal citations omitted). "'Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.'" *Johnson Reg'l Med. Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A factual dispute is genuine if the evidence could cause a reasonable factfinder to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989) (citation omitted).

Parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008), *cert. denied*, 522 U.S. 1048 (1998). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

**IV. Failure To Accommodate Legal Standard**

"The ADA prohibits employers from discriminating 'against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.'" *Ehlers v. Univ. of Minn.*, 34 F.4th 655, 659 (8th Cir. 2022) (quoting 42 U.S.C. § 12112(a)). This discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). A disability discrimination and failure to accommodate claim brought under the

ACRA applies the same standards as the ADA. *Schaffhauser v. United Parcel Service, Inc.*, 794 F.3d 899, 905 (8th Cir. 2015); *Jackson v. City of Hot Springs*, 751 F.3d 855, 863–64 (8th Cir. 2014).

"To establish a *prima facie* case of disability discrimination, [Hilburn] 'must show that he (1) has a disability within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) suffered an adverse employment action as a result of the disability.'" *Goosen v. Minn. Dep't of Transp.*, 105 F.4th 1034, 1040 (8th Cir. 2024) (quoting *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 711 (8th Cir. 2003)).

## V. Analysis

In order to establish a claim of failure to accommodate under the ADA and ACRA,[7] Hilburn "must establish both a *prima facie* case of discrimination based on disability and a failure to accommodate it." *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 905 (8th Cir. 2015).

### A. Hilburn's Motion For Partial Summary Judgment

#### 1. Qualified Individual Under The ADA

The Court will first address whether Hilburn is a qualified individual under the ADA. To be a qualified individual under the ADA, "an employee must (1) possess the requisite skill, education, experience, and training for [his] position, and (2) be able to perform the essential job functions, with or without reasonable accommodation." *Goosen*, 105 F.4th at 1040 (internal quotations omitted). "An employee bears the burden of proving that []he is a

[7] Claims for disability discrimination under the ACRA are analyzed using the same principles employed to analyze claims under the ADA. *Duty v. Norton-Alcoa Proppants*, 293 F.3d 481, 490 (8th Cir. 2002); *see also Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911, 921 (8th Cir. 2018).

'qualified individual.'" *Siebrecht v. Mercy Health Services – Iowa Corp.*, 163 F.4th 524, 530 (8th Cir. 2026) (citation omitted). !

"'An employer has the burden of showing a particular job function is an essential function of the job.'" *Siebrecht*, 163 F.4th at 531 (quoting *Rehrs v. Iams Co.*, 486 F.3d 353, 356 (8th Cir. 2007)). Essential functions are distinguished from marginal functions. *Goosen*, 105 F.4th at 1040. Essential functions are "'the fundamental job duties of the employment position the individual with a disability holds or desires' and vary according to the job." *Id.* (quoting *Minnihan v. Mediacom Commc'ns Corp.*, 779 F.3d 803, 810 (8th Cir. 2015)). An employer's judgment about whether a function is an essential job function "is considered highly probative." *Duello v. Buchanan Cnty. Bd. Sup'rs*, 628 F.3d 968, 972 (8th Cir. 2010). The Eighth Circuit has directed that:

> When determining what constitutes an essential job function, we consider evidence such as: '(1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs.'

*Siebrecht*, 163 F.4th at 531 (quoting *McNeil v. Union Pac. R.R. Co.*, 936 F.3d 786, 789–90 (8th Cir. 2019)). "[A] task may be an essential function even if the employee performs it for only a few minutes each week, and even if other employees are available to perform the task for the disabled employee." *Minnihan*, 779 F.3d at 812.

The parties do not contest whether Hilburn possesses the requisite skill, education, experience, and training for his position. The Court agrees that there is no dispute of material fact as to Hilburn's skill, education, experience, and training. Accordingly, to determine whether Hilburn is a qualified individual, the Court will turn to whether Hilburn is capable of performing

the essential job functions of a Crane Operator with Lexicon, with or without reasonable accommodation.

**a. Performance Of Essential Functions Without Reasonable Accommodation**

Lexicon argues that Hilburn cannot perform the essential functions of the job as a Crane Operator without accommodation (Dkt. No. 14). Hilburn concedes that he cannot perform the essential functions of the Crane Operator position without accommodation.

The Court finds that there is no dispute of fact as to whether Hilburn's disability impedes his capacity to perform the essential functions of a Crane Operator without reasonable accommodation. Lexicon asserts that an essential function of a Crane Operator is to operate a crane (Dkt. No. 15-17).

Based upon the undisputed record evidence before the Court, there is no dispute about the exact functions of the Crane Operator position at Lexicon. Further, based upon the undisputed record evidence, following Hilburn's right carpal tunnel surgery due to his medical limitations, Hilburn could not after his surgery, up to the time of his termination, and cannot now operate a crane (Dkt. No. 11-5 (Hilburn Dep.), at 13:2-6, 178:4-8, 177:17-19, 181:7-8, 230:25- 231:5, and 246:4-6). Dr. Cole, Hilburn's doctor, did not and has not cleared Hilburn to return to active duty (Dkt. Nos. 11-4 (Thomas Dep.), at 9:24–10:2, 33:6–9, 34:24–35:3, 35:4–9, 35:24–36:6, 37:11–19, 38:20–21, 39:3–9, 41:5–16, 52:6–10, 76:2–13); 11-5 (Hilburn Dep.), at 16:1-6, 101:15–21, 109:5–18, 162:2–24; 177:2–5, 178:7–14, 182:2–12;15-6; 15-7; 15-18). Hilburn's injuries, coupled with the lack of medical clearance, mean that Hilburn cannot return to performing the undisputed essential functions of a Crane Operator with Lexicon without accommodation. Thus, the Court concludes that no reasonable factfinder could find that Hilburn could perform the essential functions of his Crane Operator position without accommodation.

Given this, the Court turns to whether Lexicon failed to provide reasonable accommodations to Hilburn prior to terminating his employment with Lexicon that would have allowed Hilburn to perform the essential functions of the Crane Operator position.

**b. Performance Of Essential Functions With Reasonable Accommodation**

A reasonable accommodation may include the reallocation of duties or the reassignment of an employee. *Faidley v. United Parcel Service of America, Inc.*, 889 F.3d 933, 941 (8th Cir. 2018) (citing *Cravens v. Blue Cross & Blue Shield of Kan. City*, 214 F.3d 1011, 1018 (8th Cir. 2000)). However, "an employer need not reallocate or eliminate the essential functions of a job to accommodate a disabled employee." *Dropinski v. Douglas County, Neb.*, 298 F.3d 704, 709–10 (8th Cir. 2002); *see Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944, 950 (8th Cir. 1999). Moreover, "[w]hile reassignment to a vacant position can be a reasonable accommodation under the ADA, it is not necessarily required." *Burchett v. Target Corp.*, 340 F.3d 510, 517 (8th Cir. 2003).

Lexicon argues that it was not required to discuss a reasonable accommodation with Hilburn because Hilburn could not return to work in any capacity given his doctor's failure to clear him to return to duty (Dkt. Nos. 15-6; 15-7; 15-18). Hilburn argues that Lexicon was required to offer him a reasonable accommodation and should have offered him a finite period of medical leave (Dkt. No. 12, at 6–8). Alternatively, Hilburn contends that Lexicon should have offered him a modification of the Crane Operator position so that he could have performed the essential functions of the position without the use of his restricted right hand. Finally, Hilburn suggests that his mention of the possibility of returning to "light duty" work to his supervisor prior to his surgery should have led Lexicon to offer Hilburn "light duty" work.

Based upon undisputed record evidence, in July 2024, Hilburn's treating physician, Dr. Cole, informed Hilburn that his right hand would require carpal tunnel release surgery. On September 18, 2024, Dr. Cole performed the surgery. Lexicon, based on information provided by Dr. Cole after he was provided with the job description for a Crane Operator, determined that Hilburn qualified for FMLA leave, and Hilburn was placed on FMLA leave beginning September 18, 2024.

There is undisputed record evidence that, following surgery, every medical document Dr. Cole provided to Lexicon communicated that Hilburn was unable to return to work at all until Hilburn was medically cleared for duty by Dr. Cole. Lexicon received the following documents from Dr. Cole:

- FMLA certification from Dr. Cole, dated September 17, 2024, stating that Hilburn would be incapacitated from September 18 until "TBD" and "will need to be off duty until cleared at one of the post-op visits." (Dkt. No. 15-6).
- October 16, 2024, post-operative visit documentation from Dr. Cole stating Hilburn is "unable to return to work: The patient will be off duty until further evaluation." (Dkt. No. 15-7).
- November 18, 2024, post-operative visit documentation from Dr. Cole stating Hilburn is "unable to return to work: The patient will be off duty until further evaluation in 4 weeks." (*Id.*).
- November 18, 2024, Short-Term Disability Medical Update from Dr. Cole stating: "Patient is off duty until cleared by Dr. Cole. Patient is unable to use right wrist." (Dkt. No. 15-18). The form identifies Hilburn's physical restrictions as: "unable

> to push/pull/lift/grip anything with his right arm." (*Id.*). The return-to-work date is listed as "12/16/24 – may change." (*Id.*).

None of Dr. Cole's documents provided contemporaneously with his examinations of Hilburn mention returning to work with restrictions limited only to Hilburn's right hand, wrist, or upper extremity. None of Dr. Cole's documents provided contemporaneously with his examinations of Hilburn mention the possibility of Hilburn returning to "light duty."

There is undisputed record evidence that Dr. Cole was provided the Lexicon job description for Crane Operator in order to make his assessments (Dkt. No. 11-5, at 143–44). The job description provides that the Crane Operator position "is deemed 'safety sensitive' due to the fact that a person improperly performing the essential or marginal functions of the job would constitute a threat to the health or safety of the employee, the employee's co-workers, and/or the public at large." (*Id.*, at 143). The clear message of every document that Lexicon was provided by Dr. Cole related to Hilburn was that Hilburn was to remain "off duty" until he was medically cleared (Dkt. Nos. 15-6; 15-7; 15-18). At an appointment with Dr. Cole on December 16, 2024, Hilburn was told by Dr. Cole that Hilburn was to remain off work for another four to six weeks, at which time, Hilburn would be reevaluated to determine whether he could be returned to work. Hilburn was ultimately not cleared to return to work and has not since been cleared to work (Dkt. Nos. 18, at 4–5; 11-5 (Hilburn Dep.), at 53: 2–12; 108:2–6; 162:2–24).

In what may be an attempt to create a dispute of fact on whether Hilburn could return to duty with Lexicon, Hilburn provided an affidavit from Dr. Cole with his motion for summary judgment dated August 19, 2026, in which Dr. Cole makes statements that appear to contradict the undisputed medical statements Dr. Cole created contemporaneously with his examinations of Hilburn and provided to Lexicon (Dkt. No. 11-8). The Court determines that Dr. Cole's August

19, 2026, affidavit, which was prepared after-the-fact for litigation, should be given little weight because Dr. Cole's assessment of Hilburn's ability to return to work and his restrictions in the affidavit contradict the contemporaneous assessments of Hilburn made by Dr. Cole at or near the time of his hand surgery and that were relied upon by Lexicon (Dkt. Nos. 15-6; 15-7; 15-18 compared with Dkt. No. 11-8, ¶¶ 11–23).

Further, the assessment of Hilburn's ability to return to work and his restrictions by Dr. Cole in the affidavit attached to the motion for summary judgment are contradicted by Hilburn's own record testimony about Hilburn's ability to return to work (Dkt. No. 11-5 (Hilburn Dep.), at 16:1–6; 86:2–87:18, 101:15–21; 109:5–18; 162:7–24, 246:4-6). Thus, the Court concludes that, on the undisputed record evidence before it with all reasonable inferences drawn in favor of the nonmoving party, no reasonable fact finder could find that Dr. Cole authorized Hilburn to return to work at Lexicon with a reasonable accommodation prior to Lexicon's termination of Hilburn.

For these reasons, Lexicon is entitled to judgment in its favor of Hilburn's claims. The Court will nonetheless discuss each of Hilburn's proposed accommodations.

#### i. Proposed Accommodation: Finite Additional Leave

Hilburn maintains that, although regular attendance is ordinarily an essential function of employment, medical leave may constitute a reasonable accommodation where the requested leave is finite and reasonably likely to enable the employee to return to work (Dkt. No. 12, at 7). Hilburn never requested this proposed accommodation of finite additional leave contemporaneously but instead made this request for the first time during litigation. When the "necessary reasonable accommodation is 'not open, obvious, and apparent to the employer' the initial burden rests primarily on the employee to suggest a reasonable accommodation." *Burke v. Iowa Methodist Med. Ctr.*, 28 F. App'x 604, 607 (8th Cir. 2002).

Here the request from Hilburn to Lexicon for an accommodation of an additional period of "finite" leave was not obvious because, at the time of his termination, Hilburn told Thomas that his next medical appointment was six weeks away, at which time Hilburn's physician would reevaluate whether Hilburn could be medically cleared to return to work (Dkt. No. 11-4 (Thomas Dep.), at 72:20–73:6). There was no guarantee, or even an indication, from Dr. Cole that Hilburn would be cleared to return to work after those six weeks.

Moreover, Hilburn was ultimately not cleared at the next appointment, and Hilburn's subsequent medical history proves the indefinite nature of a suggestion of additional leave. After Hilburn's medical appointment on December 16, 2024, Dr. Cole still did not clear Hilburn to return to work. On March 13, 2025, Dr. Cole's records stated: "unable to return to work . . . off duty until further evaluation in 8 weeks." (Dkt. No. 18-1, at 1). On September 25, 2025, Dr. Cole's records stated: "unable to return to work . . . remain off work until seen in my office again in six months." (Dkt. No. 18-2, at 1). Accordingly, Hilburn's suggestion that, instead of termination by Lexicon, Hilburn could have received at that time six more weeks of leave was not "finite."

Instead, based on the undisputed record evidence before the Court with all reasonable inferences drawn in favor of the nonmoving party, what Hilburn suggests now for a proposed accommodation was at the time an indefinite and ongoing inability to return to work. *See Peyton v. Fred's Stores of Ark., Inc.*, 561 F.3d 900, 903 (8th Cir. 2009) (rejecting a proposed accommodation that the employer "wait[] indefinitely to determine the full extent of [the employee's] diagnosis, treatment, and recovery," finding that it would amount to "a reconstituted claim for an indefinite leave of absence" because the employee had "had no idea when, if ever, she would be able to return"). Hilburn recognized in his deposition that Lexicon was not obligated

to wait an indeterminate period of time for him to be released to return to work (Dkt. No. 15-1 (Hilburn Dep.), at 162:7–163:8; 177:2–10).

Under the ADA and on the undisputed record evidence before the Court with all reasonable inferences drawn in favor of the nonmoving party, Lexicon was not required to grant Hilburn a continuing six-week period of leave until Hilburn was released to work as an accommodation.

**ii. Proposed Accommodation: Modification Of Crane Operator Position**

Hilburn also suggests that Lexicon should have accommodated him with a modification of the Crane Operator position (Dkt. No. 12, at 8–10). Hilburn suggests that "Lexicon understood that Hilburn's physical restriction concerned his right hand and that he remained capable of using his left hand." (*Id*., at 9 (citing Dkt. No. 11-4 (Thomas Dep.), at 74:7–16). Even though there is record evidence that Thompson realized this, there is no record evidence that Hilburn could perform the duties of Crane Operator even with one hand. According to the record evidence, operating a crane is an essential function of the job of Crane Operator at Lexicon (Dkt. No. 11-5, at 143-144). On the record evidence before the Court, Hilburn testified that working as a Crane Operator requires the use of two hands, and Hilburn admitted that he could not safely operate a crane without the use of both hands (Dkt. No. 11-5 (Hilburn Dep.), at 86:2–87:18, 246:4-6).

In his August 19, 2026, affidavit offered in support of the motion for summary judgment, Dr. Cole states that his medical restrictions "were directed toward protecting [Hilburn's] right hand and right upper extremity during recovery" and "were not intended to state that Mr. Hilburn had lost the use of his left upper extremity to perform work activity." (Dkt. No. 11-8, ¶¶ 11–12). However, Dr. Cole stops short in his affidavit of opining that Hilburn could perform the job of Crane Operator (*Id*.). Instead, Dr. Cole states that, "[i]f Lexicon had requested clarification regarding whether Mr. Hilburn could perform particular Crane Operator duties using his left hand

while protecting his right hand, I *could have evaluated* those particular duties in [the] light of his then-existing medical restrictions." (*Id.*, ¶¶ 18–19). Dr. Cole does not state that Hilburn could have performed the duties of Crane Operator without using Hilburn's right hand or right upper extremity, only that Dr. Cole *could have evaluated* this possibility if asked to do so (*Id.*).

Furthermore, Hilburn attached to his statement of undisputed facts the complete medical records for Hilburn provided to Sunlife. Included in those records are the "Long-Term Disability Claim Statement – Attending Physician" (Dkt. No. 21-1, at 7-10). In this statement dated March 17, 2025, Dr. Cole notes that Hilburn has been "off duty" from September 18, 2024, to "TBD-discussing 5/14/2025" (*Id.*, at 8), and Dr. Cole marked that Hilburn is not "capable of working with these restrictions/limitations" (*Id.*, at 9). Dr. Cole marked for functional limitations that Hilburn was restricted *for both his left and right hand in simple grasping, firm grasping, fine manipulation, and keyboarding.* (*Id.*) (emphasis added).

The Court concludes that, on the undisputed record evidence before it with all reasonable inferences drawn in favor of the nonmoving party, no reasonable factfinder could conclude that Hilburn could perform the job of Crane Operator with a modification.

**iii. Proposed Accommodation: Light Duty Work**

Finally, Hilburn makes reference to a "light duty" position. It is unclear what Hilburn means by "light duty" other than his belief that it involves doing work other than what his essential functions involved (Dkt. No. 11-5 (Hilburn Dep.), at 118:21–119:9).

"Reassignment is not required of employers in every instance [] and is an accommodation of last resort when the employee cannot be accommodated in his existing position." *Goosen*, 105 F.4th at 1042. "[R]eassignment to another position is a required accommodation only if there is a vacant position for which the employee is otherwise qualified." *Ehlers*, 34 F.4th at 660. "To

establish reassignment as a possible accommodation, an employee 'must make a facial showing that a position is available for which [she] qualifies.'" *Siebrecht*, 163 F.4th at 532 (quoting *Ehlers*, 34 F.4th at 660). "An employee can establish that []he qualifies for an available position by mak[ing] a facial showing that []he satisfied the legitimate prerequisites for an alternative position and would be able to perform the essential functions of that position with or without reasonable accommodations." *Siebrecht*, 163 F.4th at 533 (internal quotations omitted); *see Cravens*, 214 F.3d at 1019.

Here, Hilburn never asked for light duty or reassignment after he went on FMLA leave. Both Hilburn's July 30, 2024, text to his supervisor, Rick Frye, and Hilburn's September 16, 2024, comment to a Lexicon representative while completing paperwork related to his FMLA leave and short-term disability that Hilburn could perhaps perform light duty after his surgery predated the September 18, 2024, surgery and Lexicon's receipt of the medical documentation from Dr. Cole (Dkt. No. 11-5 (Hilburn Dep.), at 108:22-109:4, 127:4-17). Dr. Cole's medical documentation stated that Hilburn was unable to return to work and must remain off duty until cleared. Hilburn never updated Lexicon with any contrary information during that period.

Moreover, Hilburn has not provided evidence of any actual then-vacant position at Lexicon for which he was qualified, applied, and for which he could have performed the essential job functions with his medical limitations (Dkt. No. 15-1 (Hilburn Dep.), at 144:15–22 ("Q: . . . [W]hat actual alternative positions were in existence that you could have done? A: That were actively in existence at that time? . . . I'm not aware of any."). Hilburn's failure to offer evidence of any available, "light duty" position for which he was qualified and could perform the essential job functions (with or without accommodation) establishes that Hilburn has not met his burden of showing a vacant position to which he could have been reassigned. *See Goosen*, 105 F.4th at 1042

("[W]here a plaintiff failed to 'submit the job posting, the job title, or any evidence of the duties or requirements of any position,' they did not meet their evidentiary burden of making a facial showing" of a vacant position to which they could have been reassigned) (citation omitted).

Further, Lexicon was not required to create a "light duty" position for Hilburn. *See Minnihan v. Mediacom Commc'ns Corp.*, 779 F.3d 803, 814 (8th Cir. 2015); *see also EEOC Enforcement Guidance: Workers' Compensation and the ADA*, 1996 WL 33161342, at *12 ("An employer need not create a light duty position for a non-occupationally injured employee with a disability as a reasonable accommodation. The principle that the ADA does not require employers to create positions as a form of reasonable accommodation applies equally to the creation of light duty positions.").

On the record evidence with all reasonable inferences drawn in favor of the nonmoving party, the Court finds that no reasonable factfinder could conclude that the proposed accommodations offered by Hilburn were reasonable and required of Lexicon. Hilburn's request to continue working as a Crane Operator with the accommodations he proposes are not reasonable requests and were not required of Lexicon; the proposed accommodations would not have enabled Hilburn to perform the essential functions of the Crane Operator position and more specifically the essential functions that Hilburn be able to attend work and operate a crane. *See Dropinski*, 298 F.3d at 709–10 (an employer need not "eliminate the essential functions of a job to accommodate a disabled employee"). Further, Hilburn's request to be moved to "light work" also fails because Hilburn has not established that there were vacant positions for which he was qualified and for which he was capable of performing the essential functions of the job.

**2. Conclusion: Failure To Accommodate**

On the record before the Court, no reasonable factfinder could find that Hilburn was capable of performing the essential functions of Crane Operator with or without reasonable accommodation. Accordingly, Hilburn is not a qualified individual with a disability under the ADA, and the Court denies Hilburn's motion for partial summary judgment as to Hilburn's ADA and ACRA failure to accommodate claims (Dkt. No. 11).

**B. Alleged Failure To Engage In The Interactive Process Claims**

To the extent that Hilburn brings a separate claim against Lexicon for failure to engage in the interactive process with him, the Court finds that this claim also fails (Dkt. No. 12, at 17–18). To "'survive summary judgment on a reasonable-accommodation claim by showing that the employer failed to engage in an interactive process[,]'" Hilburn must show the following:

> (1) the employer knew about the employee's disability; (2) the employee requested accommodation or assistance for his or her disability; (3) the employer did not make a good-faith effort to assist the employee in seeking accommodation; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*Siebrecht*, 163 F.4th at 533 (quoting *Ehlers*, 34 F.4th at 660).

As the Court explained, no reasonable factfinder could find that Hilburn could perform the essential functions of a Crane Operator with or without reasonable accommodation. Accordingly, Hilburn "has not met [his] burden of showing that [he] could have been reasonably accommodated but for [Lexicon's] lack of good-faith effort." *Siebrech*t, 163 F.4th at 533. Based upon this failure, the Court declines to address Lexicon's specific assertion that Hilburn did not request reasonable accommodation. Even if Hilburn requested accommodation and even if Lexicon did not make a good faith effort to assist Hilburn, no reasonable factfinder could conclude that Hilburn could have been reasonably accommodated on the undisputed record evidence before the Court with all

reasonable inferences drawn in favor of the nonmoving party. Therefore, Lexicon cannot have violated the ADA under this theory. Accordingly, to the extent that Hilburn's partial motion for summary judgment includes a claim that Lexicon failed to engage in the interactive process, Hilburn's motion for partial summary judgment is denied as to that claim (Dkt. No. 11).

**C. Alleged COBRA Benefits Claim**

Hilburn appears to make a claim against Lexicon under the ADA for Lexicon's alleged failure to provide proper notice or guidance of COBRA election. As set forth above, to demonstrate a *prima facie* claim under the ADA, Hilburn must demonstrate, among other things, that he "suffered an adverse employment action as a result of the disability." *Huber v. Wal-Mart Stores, Inc.*, 486 F.3d 480, 482 (8th Cir. 2007) (emphasis added). Based upon the undisputed record evidence before the Court with all reasonable inferences drawn in favor of the nonmoving party, Hilburn cannot do so.

In the first correspondence sent to Hilburn related to his surgery, Lexicon informed Hilburn that he had to ensure payment of premiums to maintain his health insurance while on leave (Dkt. No. 15-4). As Hilburn admitted in his deposition, Hilburn failed to pay these premiums while on leave (Dkt. No. 15-1 (Hilburn Dep.), at 31:2-6, 110:20-25, and 141:13-23). On December 23, 2024, Hilburn allegedly responded to the termination letter by email, stating that Hilburn wanted to elect COBRA benefits and asked how to pay the overdue premiums, even though that information was in the termination letter itself (Dkt. No. 15-10). Hilburn eventually paid Lexicon the overdue premiums (Dkt. No. 15-1, 66:6-12).

Also on December 23, 2024, Thomas reached out to Lexicon's COBRA administrator, CAS, to request expedited benefits paperwork so that Hilburn could have coverage for an appointment in January 2025 (Dkt. No. 15-11). CAS sent a letter to Hilburn, at his correct address,

on January 6, 2025, that explained how to elect COBRA coverage (Dkt. Nos. 15-12; 15-1, at 35:21-36:5). Lexicon's records also reflect that CAS sent Hilburn this letter (Dkt. Nos. 15-7; 15-14, at 95:23-96:1, 97:3-6). Hilburn could have activated his COBRA coverage by submitting the completed form with his signature to CAS by March 7, 2025 (Dkt. No. 15-12). Hilburn did not do so. Hilburn testified that he did not receive this letter from CAS, but Hilburn admits the letter was addressed correctly and that Hilburn has never had issues receiving other mail (Dkt. No. 15-1 (Hilburn Dep.), at 35:13-36:5, 142:10-21). Accordingly, Hilburn did not have coverage under COBRA.

Throughout his deposition, Hilburn testified that he did not understand the process under COBRA, or even what COBRA is, despite having asked Lexicon specifically about COBRA coverage (*Id*., at 27:12-22, 38:8-39:23). Additionally, Hilburn did not attempt to inquire about his lack of COBRA coverage until July 2025, seven months after his initial request for information. At that time, Lexicon provided Hilburn with the information Hilburn requested (Dkt. No. 15-7; 15-1 (Hilburn Dep.), at 38:8–39:24,167:8–168:3).

Based upon the undisputed record evidence before the Court with all reasonable inferences drawn in favor of the nonmoving party, no reasonable factfinder could conclude that Lexicon discriminated against Hilburn because of his disability by denying Hilburn information regarding or benefits under COBRA. The undisputed record evidence establishes instead that Hilburn lost his health insurance because he did not pay his premiums while out on leave and did not properly elect benefits under COBRA, not as a result of any alleged discrimination by Lexicon because of Hilburn's disability. Even if the Court credits Hilburn's version of the facts that Hilburn did not receive the COBRA letter mailed by CAS on January 6, 2025, to Hilburn's correct address that explained how to elect COBRA coverage, there is no factual dispute that, on December 23, 2024,

Thomas reached out to CAS to request expedited benefits paperwork so that Hilburn could have coverage for an appointment in January 2025 (Dkt. No. 15-11). Hilburn provides no record evidence to show that any failure of the mail to arrive was because of an action or inaction taken by Lexicon, that it had anything to do with any qualifying disability under the ADA, or that a similarly situated employee outside of Hilburn's protected status was treated differently. Instead, there is record evidence that, when Hilburn contacted Thomas again regarding COBRA coverage in July 2025, Thomas provided Hilburn with the information for which Hilburn asked (Dkt. Nos. 15-1 (Hilburn Dep.), at 38:6-24, 167:8-168:3; 15-7; 15-10; 15-11; 15-12; 15-13). Accordingly, to the extent that Hilburn's partial motion for summary judgment includes a COBRA benefits claim, Hilburn's motion for partial summary judgment is denied on that claim (Dkt. No. 11).

### D. Lexicon's Motion For Summary Judgment

Having determined that, based on the record evidence with all reasonable inferences drawn in favor of the nonmoving party, no reasonable factfinder could find that Hilburn was capable of performing the essential functions of Crane Operator with or without reasonable accommodation, that Hilburn failed to make a reasonable accommodation claim against Lexicon, that Hilburn failed to make a failure to engage in the interactive process claim against Lexicon, and that Hilburn failed to make a denial of benefits claim against Lexicon, the Court grants Lexicon summary judgment on Hilburn's ADA and ACRA claims (Dkt. No. 15).

## VI. Conclusion

For these reasons, the Court denies Hilburn's motion for partial summary judgment (Dkt. No. 11) and grants Lexicon's motion for summary judgment (Dkt. No. 15) as to Hilburn's ADA and ACRA claims. The Court dismisses Hilburn's ADA and ACRA claims with prejudice. The

Court denies as moot the parties' pending motions in limine (Dkt. Nos. 35; 37; 39; 41; 43; 45; 47).

Judgment will be entered accordingly.

It is so ordered this 14th day of October, 2026.

Kristine G. Baker
Chief United States District Judge